IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEROME MARKIEL DAVIS,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>B. CATES,<br><br>　　　　　Respondent. | No. 2:21-CV-1900-KJM-DMC-P<br><br>FINDINGS AND RECOMMENDATIONS |

   Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Pending before the Court are Petitioner's first amended petition for a writ of habeas corpus, ECF No. 10, and Respondent's answer, ECF No. 17. Petitioner has not filed a traverse.  Also before the Court is Petitioner's motion, ECF No. 18, for a new trial.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# I. BACKGROUND

A. **Facts**[1]

The state court recited the following facts, and Petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> A September 2016 amended and consolidated information charged defendant with the attempted murder of Q.B. (Pen. Code, § 664/187, subd. (a)—count one), [footnote 1 omitted] discharge of a firearm at an occupied motor vehicle (§ 246—count two), grossly negligent discharge of a firearm (§ 246.3—count three), assault with a firearm on J.W. (§ 245, subd. (a)(2)—count four), and discharge of a firearm at an inhabited dwelling (§ 246—count five). The information alleged that defendant committed the attempted murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that defendant personally used a firearm (§ 12022.53, subd. (b),) [footnote 2 omitted] personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) during the offense. For the assault with a firearm offense, it was alleged that defendant personally used a firearm. (§ 12022.5, subd. (a).) The evidence at trial showed the following:
>
> ***The March 3, 2015, Shooting of Q.B.***
>
> Q.B. lived in an apartment with his mother in Sacramento. Defendant's mother lived in the same apartment complex; her apartment was located across from Q.B.'s apartment. Q.B. had seen defendant several times at the apartment complex, including sitting in a white car with his girlfriend, Cassandra Patterson.
> The apartment complex was located near a shopping center with a Taco Bell restaurant and a pizza parlor. At one point, defendant and Patterson both worked at the Taco Bell.
> Although Q.B. and defendant crossed paths occasionally, their interactions were limited. Defendant would sometimes give Q.B. free drinks at Taco Bell. One time defendant asked Q.B. for a cigarette. Another time Q.B. passed defendant on the street while walking toward the Taco Bell. Defendant was in his uniform, and Q.B. asked him how he was doing and if he had just gotten off work. Defendant responded, "Don't worry about when I'm getting off work. I don't want nobody knowing my schedule." Q.B. responded that he did not want any problems, and the two men continued walking in opposite directions.

///

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant." The foregoing summary of facts is derived from the California Court of Appeal's September 28, 2018, decision in People v. Davis, case no C-84396. See ECF No 16-12.

On another occasion, Q.B. was in a store waiting to purchase an ice cream. Defendant walked in and stood right behind him. According to Q.B., defendant did not purchase anything and was "mean mugging" him. After Q.B. purchased his ice cream, defendant followed him outside.

In early March 2015, Q.B. and his cousin, R.M., walked to pick up a pizza from the Round Table near his mother's apartment. Defendant pulled up in a white car with tinted windows and hopped out. He repeatedly demanded to speak with Q.B. When Q.B. declined, defendant continued to follow Q.B. and his cousin back to the apartment. R.M. felt threatened, and told Q.B. to go into his mother's apartment. Defendant pointed at Q.B. and said, "You ain't from Oak Park. UZ. UZ." Q.B. was not in a gang and was unfamiliar with the term UZ, which the prosecutor's gang expert explained stood for Underworld Zilla, a subset of the Oak Park Bloods. According to R.M., defendant said, "on UZ blood" that it was not over and that he would see Q.B. again. Q.B. did not know of any reason why defendant would have a problem with him. Defendant eventually left.

On March 3, 2015, a few days after defendant followed Q.B. and his cousin from the pizza parlor, Q.B. visited his grandmother at her apartment on Munson Way in Sacramento. While standing outside talking on the phone, Q.B. saw defendant drive by in the white car he had previously seen him in with his girlfriend. Defendant's girlfriend was in the front passenger seat leaning back. Defendant passed by Q.B., backed up, rolled down the passenger window, pointed a red laser light at Q.B., and fired multiple shots. Q.B. tried to dodge the red light but was struck by a bullet in the chest, causing severe injuries. Before he was transported to the hospital by emergency personnel, Q.B. told an officer that his cousin, R.M., knew the guy who shot him since he had followed them a few days earlier. R.M. learned of the shooting a short time later, and directed officers to the apartment complex where defendant's mother and Q.B. lived.

As a result of the shooting, Q.B. was hospitalized for several weeks and underwent nine surgeries. After he was released from the hospital, Q.B. positively identified defendant as the shooter in a photographic lineup.

Several neighbors also witnessed the shooting. Each described seeing a white car pass by, back up and then start shooting toward the apartments.

***The April 25, 2015, Shots-Fired Incident***

The next month, on April 25, 2015, an officer responded to an area in Sacramento near Riverside Boulevard after receiving multiple calls of shots fired. The officer found several .40-caliber shell casings in the street that had likely been expended from a moving car. The shells were booked in the police evidence warehouse.

***The April 27, 2015, Shooting of J.W.***

Two days later, on April 27, 2015, defendant fired several shots into an apartment shared by J.W. and Jermaine Mosby, defendant's cousin. Both J.W. and Mosby were home at the time. A bullet struck J.W. in the shoulder. According to J.W., defendant and Mosby were very close and there were no issues between them. J.W. also got along well with defendant, describing their relationship as "cool."

3

*Defendant's Arrest*

In early May 2015, Patterson, defendant's girlfriend, called police to report that defendant had her car and that there were guns inside the car. While Patterson spoke with an officer behind the Taco Bell where she worked, defendant drove up in Patterson's car and approached them. Defendant was arrested, and the car was searched. Officers located two loaded handguns underneath the driver's seat: a .40-caliber handgun and a .38-caliber revolver. Defendant's wallet, loose ammunition, a gun holster and a loaded magazine were also found in the car. Defendant's fingerprints were on the magazine, and the magazine fit the .40-caliber handgun found in the car.

*Patterson's Police Interview[2]*

The day of defendant's arrest, police interviewed Patterson. Because she refused to testify during trial, [footnote 3 omitted] her recorded police interview was played for the jury.

During the interview, Patterson explained that defendant originally wanted to kill Q.B. during the encounter near the pizza parlor but there were too many people around. Several days later, while driving her car, defendant saw Q.B. standing outside an apartment complex and shot at him. She was in the front passenger seat at the time. Patterson said that defendant thought people, including Q.B., were after him. She also said defendant was an Oak Park Blood gang member and a member of its subset, Underworld Zillas. [footnote 4 omitted].

Patterson was also present in the car when defendant shot at two vehicles on April 25. Defendant thought his cousin, Jermaine Mosby, was in each of the cars he targeted. Defendant threw the spent shell casings out of the window while Patterson was driving.

Patterson told the officer that defendant also wanted to kill Mosby. On the morning of April 27, defendant had Patterson drop him off near Mosby and J.W.'s apartment. Defendant told Patterson that he went up to their apartment, saw his cousin's car in the parking lot, knocked on the door, and started shooting when he heard footsteps inside the apartment. He shot at the door and side window. When defendant returned to Patterson's car, she saw him eject the bullet casings from a revolver and wipe them down before dumping them out of the car's window at another location.

Patterson eventually led the detective to the area where defendant dumped the bullet casings. Four .38-caliber casings were found.

The shell casings defendant dumped after he shot J.W. were matched to the .38-caliber revolver found in Patterson's car. The shell casings collected after the April 25 shots-fired incident were matched to the .40-caliber handgun found in Patterson's car.

///

///

///

---

[2] Patterson and Petitioner were married while Petitioner was in custody awaiting trial. See ECF No. 16-12, pg. 5, n.3.

4

*Defendant's Testimony at Trial*

Against the advice of his counsel, defendant testified on his own behalf. He denied committing any of the shootings.

According to defendant, he and Q.B. were on good terms. They never had any problems; defendant gave Q.B. free food for his family when he worked at Taco Bell, and sometimes bought marijuana from him. Although he admitted responding rudely to Q.B. one time when they passed on the street, he said he had had a bad day at work and was frustrated. He further testified that the day he followed Q.B. and R.M. back to Q.B.'s apartment from the pizza parlor was so that he could buy marijuana from him. He said he had no reason to believe, nor did he believe that his cousin, Jermaine Mosby, was in cahoots with Q.B. to get him. He denied shooting Q.B. in front of his grandmother's apartment.

Defendant also said he was close with his cousin, Mosby, and considered him his brother. He never had any problems with Mosby or with his girlfriend, J.W. He denied shooting at their apartment.

Defendant denied the shooting that occurred near Riverside Boulevard on April 25. According to him, there was no reason for him to do something like that.

Defendant also denied any current gang affiliations, although he knew a lot of people in gangs. When confronted with several recordings from jail phone calls or jail visits he had with Patterson while awaiting trial, defendant denied trying to convince Patterson not to testify against him.

Defendant claimed he borrowed Patterson's car on the day he was arrested without knowing the two firearms were underneath the driver's seat. He discovered the firearms when he adjusted the seat. He immediately drove to Patterson's workplace because he did not want to be in the car with two guns. He said none of the statements Patterson made during her police interview were true.

**B.     Procedural History**

Petitioner was convicted of various offenses related three separate shootings, including the attempted murder of Q.B.  See ECF No. 16-12, pg. 1 (California Court of Appeal decision in People v. Davis, case no. C084396).  Petitioner was sentenced to a total aggregate term of 17 years three months, plus 25 years to life.  See id.  On September 28, 2018, the California Court of Appeal vacated the sentence and remanded for resentencing.  See id.  Petitioner's petition for review was denied by the California Supreme Court on December 12, 2018.  See ECF No. 16-14 (California Supreme Court decision in People v. Davis, case no. S252207).

///

///

///

On remand following the California Court of Appeal's September 28, 2018, decision, the trial court exercised its discretion to strike a firearm enhancement and resentenced Petitioner to a determinate term of 30 years four months in state prison.  See ECF No. 16-15 (California Court of Appeal decision in People v Davis, case no. C090521).  Once again, the appellate court remanded for resentencing on June 5, 2020.  See id.  Petitioner was resentenced on August 27, 2021, and did not appeal.

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  Under AEDPA, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law.  Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision.  See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412).  "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue.  See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the

question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See

7

Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

### III. DISCUSSION

Petitioner raises a single claim in his first amended petition. Specifically, Petitioner contends: "Sua sponte duty to a letter included offense of attempted voluntary manslaughter." ECF No. 10, pg. 4. Petitioner adds: "Trial court erred in falling to instruct the jury sua sponte on attempted voluntary manslaughter based on unreasonable or imperfect self-defense as a lesser included offense to attempted murder." Id. The California Court of Appeal addressed this claim in the September 28, 2018, opinion. See ECF No. 16-12, pgs. 10-12. In rejecting this claim, the state court first held that, under California law, a trial court has a duty to sua sponte instruct on a lesser offence necessarily included in the charged offense if there is

substantial evidence the defendant is guilty only of the lesser offense. See id. at 10. As to the doctrine of imperfect self-defense, the state court held:

> The doctrine of imperfect self-defense is " 'narrow.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) " 'It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*Ibid.*)

ECF No. 16-12, pg. 10.

Applying these principles, the state court rejected Petitioner's claim:

> On appeal, we apply a de novo standard of review. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) After examining the record, we conclude it is devoid of evidence suggesting that when defendant shot Q.B. he harbored an actual belief in the need for self-defense against an *imminent* danger to life or great bodily injury. To the contrary, defendant testified that he and Q.B. were friendly, that he had no problems with Q.B., that he bought marijuana from him, and that he did not believe Q.B. and his cousin were in "cahoots" to get him. Q.B., in turn, testified that he barely knew defendant and that there was no reason defendant would have had a problem with him. Both Q.B. and defendant testified that defendant would sometimes give him free food at Taco Bell.
> Q.B., moreover, was standing outside his grandmother's apartment talking on the phone when defendant drove by, reversed, rolled down the window, and fired multiple rounds. The men were not engaged in hand-to-hand combat or a heated dispute at the time of the shooting. Q.B. was not affiliated with any rival gang, and no evidence showed that Q.B. ever had a weapon or threatened defendant in any way.
> Patterson's statements to police that defendant was paranoid and someone was out to get him because he had recently been shot at while in her car, or defendant's statement to Patterson during a jail visit that he would not need to look over his shoulder once they moved out of state, at most revealed that defendant may have harbored some fear of future harm but provided no indication that defendant " '*actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury' " the night he shot Q.B. (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 582.) The evidence was insufficient to require the court to instruct the jury sua sponte on attempted voluntary manslaughter as a lesser included offense of attempted murder. [footnote 5 omitted] (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824-825.)

ECF No. 16-12, pgs. 11-12.

///

///

///

9

The Court agrees with Respondent that Petitioner's federal habeas claim fails as a matter of law because the U.S. Constitution imposes no duty to sua sponte instruct on a lesser-included offense in a non-capital case.  See Henderson v. Kibb, 431 U.S. 145, 154 (1977); see also Osborne v. Ohio, 495 US. 103, 123 (1990); Namet v. United States, 373 U.S. 179, 190 (1963); Boyd v. United States, 271 U.S. 104, 108 (1925); Allis v. United States, 155 U.S. 117, 122 (1894); but see Beck v. Alabama, 447 U.S. 625, 638 (discussing duty to sua sponte instruct on lesser-included offenses in a capital case).  Quite simply, Petitioner does not present a federal constitutional claim.  See James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976); Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984); turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995); Solis v. Garcia, 219 F.3d 922, 928-29 (9th Cir. 2000).

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Petitioner's first amended petition for a writ of habeas corpus, ECF No. 10, be denied; and

2. Petitioner's motion, ECF No. 18, for a new trial be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  September 12, 2022

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE